IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT WING, as Receiver for VesCor Capital Corp., et al., <br><br> Plaintiff, <br><br><br><br> vs. <br><br><br> CHRISTOPHER D. LAYTON, et al., <br><br> Defendants. | MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT <br><br><br><br><br><br><br> Case No. 2:08-CV-708 <br><br> Judge Dee Benson |

The plaintiff, Robert G. Wing, as Receiver for VesCor Capital Corp. and numerous other related entities controlled by Val Southwick and VesCor,[1] moves this court for summary judgment, arguing that the undisputed facts show that payments made by VesCor to Christopher D. Layton and Layton's affiliated entities were fraudulent transfers. (Dkt. No. 156.) The defendants, Christopher D. Layton, ATG Capital, LLC, Cromwell Property Management, LLC, Icarus Holdings, Inc., Moriarty, LLC, Siena Office Park 2, LLC, Siena Office Park 3, LLC, Siena Vista, LLC, SOP 871, LLC, SOP Equity, LLC (collectively "Layton") opposed the

---

[1]Mr. Southwick operated over 150 corporations and limited liability companies. For simplicity, the court refers to these corporations collectively as VesCor.

1

motion. (Dkt. No. 172.) At oral argument on the motion, M. David Eckersley appeared on

behalf of the Receiver and Matthew L. Lalli appeared on behalf of the defendants. After

considering the parties' written and oral arguments, the court requested a status conference on

the matter at which time the court asked additional questions and issued a preliminary ruling

from the bench, granting the Receiver's motion for summary judgment. This Memorandum

Opinion and Order memorializes and explains in greater detail the court's oral ruling.[2]

## FACTUAL BACKGROUND

This action is one of many arising out of the collapse of an alleged Ponzi scheme

orchestrated and run by Val Edmund Southwick through a complex web of over 150

corporations and limited liability companies known collectively as VesCor.

VesCor described its business as financing, ownership, development, management and

acquisition of commercial and residential real estate in the Western United States. (Dkt. No.

157-1, Amended Expert Report & Disclosure of Gil Miller at 4.) Investors were solicited by

managers of the company itself as well as various outside advisors that were paid commissions

and/or referral fees for attracting new investors. Investors were typically promised safe

investments secured by valid liens on real property. In many cases, VesCor represented that its

total debt was no more than 50% or 65% of the fair market value of its assets. (Id.) Investors

---

[2]The parties filed several additional motions related to the underlying motion for
summary judgment. These include: Receiver's Motion to Determine Daubert Issues and Request
for Hearing re: Steven G. Black (Dkt. No. 150); Defendants' Motion to Exclude Unreliable
Opinion Testimony of Gil A. Miller (Dkt. No. 152); Receiver's Motion to Determine Daubert
Issues and Request for Hearing re: Melinda Harper (Dkt. No. 155); Defendants' Motion to
Exclude Exhibit X to Plaintiff's Memorandum in Support of Motion for Summary Judgment
(Dkt. No. 170); and Receiver's Motion to Strike the Declaration of Stephen Johnson (Dkt. No.
188.) These motions will be addressed, where relevant, within this Opinion.

were promised, and in the beginning were often paid, annual interest rates of between 10% and 24% per year, with favorable loan discounts often resulting in significantly higher rates of return. (Id.)

However, in early 2006, VesCor's obligations to investors became too great to pay and VesCor stopped making regular payments of principal and interest to investors. At that time, VesCor began to sell or attempt to sell properties to continue to pay and repay some investors and entered into negotiations with other investors. Even so, Southwick maintained that the fair market value of VesCor's projects could repay all investors in full. (Id.)

On February 6, 2008, the United States Securities and Exchange Commission filed suit against Southwick and VesCor, alleging violations of the anti-fraud provisions of the Securities Act of 1933 and the Securities and Exchange Act of 1934. On March 31, 2008, in a Utah state court criminal case, Southwick pleaded guilty to nine felony counts of securities fraud. He later was sentenced to serve the maximum time allowed, nine consecutive 1 to 15 year prison terms.

On May 5, 2008, this court appointed Robert G. Wing as Receiver for VesCor. Since then, the Receiver, or others on his behalf, has met with and interviewed various VesCor employees, financial advisors, Southwick, investors and others. The Receiver has also obtained the services of a forensic accountant, Mr. Gil A. Miller, who reviewed and analyzed various financial records, tax returns, investor reports and other contemporaneous VesCor records.

After compiling and reviewing the financial and business records for VesCor, the Receiver asserts that VesCor was in fact a Ponzi scheme. To support this allegation, the Receiver has released several declarations of his expert, Mr. Miller, the forensic accountant. Mr.

Miller's professional opinion is that VesCor "exhibited characteristics of a Ponzi scheme" beginning as early as 2000. According to Mr. Miller, although VesCor represented that it was in the business of real estate development and lending, it never exhibited a successful underlying business, as demonstrated by continual losses and negative operating case flow. (Dkt. No. 157-1, Amended Miller Report at 25.) Moreover, VesCor mischaracterized the nature of investment opportunities, mischaracterized the risks associated with the investments, and misstated the security collateralizing the investments. (Id.) According to Mr. Miller, VesCor actively concealed its losses by paying earlier investors with money raised from later investors. (Id.)

Additionally, the Receiver obtained testimony from former VesCor employees to establish that the VesCor entities were all part of Southwick's scheme. For example, a controller for VesCor, Monique Fisher, testified that VesCor commingled investor money. According to Ms. Fisher, when there was not enough money in one account to satisfy VesCor's obligations, Mr. Southwick would transfer money between accounts in order to meet VesCor's obligations. (Dkt. No. 157-13, Monique Fisher Dep. at 15.) In addition, Ms. Fisher testified that new investor money was routinely used to pay old investors.

Another VesCor controller, Jeff Galyean, stated:

Incoming investments would generally be deposited into one account, then transferred to the VesCor Capital Corp. bank account. The money in the bank accounts I oversaw was treated as one pool of cash when expenses came due. Southwick approved expenses, and the accounting department drew cash from the various accounts in order to meet VesCor's obligations. If the entity that owed the obligation did not have enough cash in its account, money would be transferred from the accounts of other entities with cash to the entity owing the obligation.

(Dkt. No. 157-14, Jeff Galyean Decla. ¶ 13.)

<u>Defendant Christopher Layton and Layton-Related Entities</u>

On September 19, 2008, the Receiver filed the instant case against Christopher D. Layton and several Layton-related entities, seeking the return of funds Layton received from VesCor because they were fraudulent transfers. (Complaint ¶¶ 54-59.)

Layton was a Principal of VesCor and began working with Southwick and VesCor in April 2001. Layton came to VesCor with a prestigious education and employment experience. He received a Masters in Business Administration from Yale University after matriculating graduate studies at the London School of Economics and graduating from Brigham Young University. Layton's prior employment included Barclays Capital, Seneca Financial and the Nash Corporation in their respective investment banking and mergers and acquisitions divisions.

According to Layton's resume and various VesCor records, he was a Principal of the VesCor Capital group beginning in 2001. (Defs.' Opp'n Mem. at 56, Southwick Decl. ¶ 13.) He was also "a member of [VesCor's] Investment Committee . . . , active in transaction sourcing and structuring, capital sourcing, mergers and acquisitions, strategy and portfolio management oversight." (Pl.'s Mem. in Supp., Ex. H, 12/29/2004 email.) Layton's responsibilities included raising capital for VesCor through direct solicitation of investments and issuance of securities to private investors. According to Layton's resume, he was a "[l]iason with potential and existing investors in addition to nurturing commercial and private industry relationships; interface regularly with legal counsel and investment advisors." (Dkt. No. 157-1, Amended Miller Report at 5.)[3]

_____

[3]Layton filed a Motion to Strike Exhibit X to Plaintiff's Memorandum in Support of Motion for Summary Judgment. (Dkt. No. 171.) Exhibit X is an unauthenticated copy of Eva

Layton was also the Managing Director of a group of companies denominated VesCorp Capital, LLC (with a "p", as opposed to VesCor) that began operating around June 2003. According to Layton, there came a time when Southwick was planning to leave VesCor to serve a mission for the Church of Jesus Christ of Latter Day Saints. Southwick wanted Layton to take over VesCor, and the VesCorp companies were established by Southwick and Layton as vehicles for transferring VesCor assets to Layton. According to Mr. Miller, VesCorp and VesCor operated as a single economic unit. (Dkt. No. 157-1, Amended Miller Report at 32.) Like VesCor, VesCorp exhibited the characteristics of a Ponzi scheme from its inception. (Id. at 35.) VesCorp raised $28 million from investors which did not go to any business activity, but was used to pay earlier investors in VesCorp or VesCor. (Id. at 32.) VesCorp's tax returns for 2004 and 2005 report only losses and book value insolvency. (Id. at 34.) According to Mr. Miller, VesCorp Capital could not meet its obligations and could not generate a profit because it did not conduct any business designed to make a profit. It took money from investors, giving them notes in return, and that money was then swallowed up into the VesCor commingled accounts. (Dkt. No. 157-1, Amended Miller Report at 32-35.)

Layton was paid a six-figure annual salary for his work with VesCor. (Id., Ex. 2.) In addition, Layton and/or the entities represented to be affiliated with Layton, including ATG

---

M. Lee's investor claim form. The claim form was offered by the Receiver to show Ms. Lee's contact with Layton, the amount of her investment, and the percentage of return she was promised. (Pl.'s Mem. in Supp. of Motion for SJ, at 12, ¶ 52.) Layton asserts that the claim form is inadmissible hearsay and should not be considered with the motion for summary judgment. (Defs.' Mem. in Supp. of Mot. to Strike Exhibit X, at 2-3.) The court agrees with Layton that the claim form submitted as Exhibit X is hearsay and is not the type of statement to which Rule 803(15) applies. Accordingly, the court GRANTS Layton's motion to strike the claim form and all references thereto.

Capital, LLC, Cromwell Property Management, LLC, Icarus Holdings, Inc., Moriarty, LLC, Siena Office Park 2, Siena Office Park 3, SOP 871, and SOP Equity, LLC (collectively the "Layton Affiliated Entities"), also received various bonuses, commissions, and equity interests for work on certain VesCor projects.[4] In fact, according to the Receiver, most of the money Layton received from VesCor came from "equity participation" in VesCor's projects, and the Receiver alleges that Layton misused his authority as a Principal by diluting company assets through restructuring entities for his own benefit.

For example, Layton was the manager of the KOJO SeaCliff self-storage project in Huntington Beach, California ("KOJO"). According to the available records, KOJO was funded with VesCor investor money. KOJO did not have its own bank account for the first two years of its existence, until May 2003, and all of its operating costs prior to that time were paid directly by VesCor. (Dkt. No. 157-71, Miller Report in Response to Harper Report at 15.) Although Layton managed the project, it was controlled by Southwick, and Southwick signed the income tax returns. VesCor used the KOJO project to attract new investments, which investments were simply used to pay the returns of earlier investors. (Dkt. No. 157-1, Amended Miller Report at 10.) When the KOJO SeaCliff project was sold in 2006, Layton received a bonus payment of $2,387,484.97.

Mr. Layton was also involved with the development of Siena Office Park in Henderson, Nevada. Siena Office Park was originally purchased in 2001 with money from various VesCor

---

[4]The Receiver, through his expert Mr. Miller, listed the various payments, equity and disbursements given to Layton and Layton's affiliated entities in Exhibit 2 to the Amended Expert Report and Disclosure of Gil A. Miller. (Dkt. No. 157, Ex. 2.) According to this document, the total disbursements to Layton amount to $14,972,697.05. (Id. at 1.)

investors.  It was controlled by Southwick and continually funded by VesCor investor funds.

Through the creation of various companies as well as subsequent transfers and assignments,

VesCor ultimately assigned title to three commercial office buildings at Siena Office Park to

Layton.  Although two of the buildings have since been sold, Layton continues to claim

ownership of Siena Office Park 871, which has an estimated equity value of $3,650,000.  (Dkt.

No. 157-71, Exhibit DDD, Miller Report in Response to Harper Report at 18-19; Dkt. No. 157-1,

Amended Miller Report at 6.)

　　　　Layton also acted as the real estate broker for VesCor's seller-financed purchase of over

5,600 acres of industrial land at Apex Industrial Park, also located in Nevada.  Layton was paid

nearly $3 million in commissions for brokering this deal, which was ultimately foreclosed on by

the seller.  (Dkt. No. 157-1, Amended Miller Report at 19.)

　　　　Ultimately, however, Layton's experience with Southwick and VesCor came to an

unpleasant end.  In a September 2007 email from Layton to Southwick he states:  "In absolute

clarity, you cannot say that my silence has not been of enormous value to you.  My actions have

served your interests.  As I promised, I did not allow you to be left to the wolves or the rats or

the vultures."  Layton continues:

> I have tried to share with you the deep sorrow and pain.  My family has literally gone
> through hell because of this.  I look at my little girls and the wonderful souls that they are
> and I am ill to think what has become of the young idealist that I once was.  I am
> ashamed.  When you met Jae and I, we were on top of the world; a young Yale graduate,
> with a few years on Wall Street and a young wife planning a family.  It is now a
> nightmare.  Personal relationships are in taters [sic] and these are the only things that
> matter; relationships are all that can transcend this realm.  In a moment of clarity, I
> cannot believe I have fallen so far.  I truly regret my weakness and am ashamed of it.  I
> can hardly recognize my spirit.

(Pl.'s Mem. in Supp. at 47; Dkt. No. 157-70, Ex. CCC.)

Via this lawsuit, and pursuant to the Uniform Fraudulent Transfer Act (UFTA), the Receiver is seeking return of the funds VesCor transferred to Layton.[5]  The Receiver alleges that VesCor was a Ponzi scheme and therefore the funds Layton received from VesCor were fraudulent transfers.  On September 7, 2012, the Receiver filed the motion for summary judgment that is now before the court.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56( c); <u>see also</u> Utah R. Civ. P. 56 (c).  "A 'material fact' is one 'that might affect the outcome of the suit under the governing law, and a 'genuine' issue is one for which 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Pelt v. Utah</u>, 539 F.3d 1271, 1280 (10th Cir. 2008) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)) (internal citation omitted).

The Receiver argues that he is entitled as a matter of law to a judgment that the funds transferred to Layton and the Layton-related entities were fraudulent transfers.  More specifically, the Receiver asserts that he has met his summary judgment burden because he has provided evidence sufficient to show that VesCor was a Ponzi scheme and therefore, applying

---

[5]Originally, the Receiver sought to clawback all of the funds transferred from VesCor to Layton.  However, at the March 7, 2013 hearing, the Receiver agreed that it would forego the return of Layton's annual salary, and would pursue only those transfers Layton received in addition to his annual salary.  (Tr. of March 7, 2013 hearing at 5.)

the Ponzi scheme presumption – which this court has adopted in the larger receivership case – the transfers to Layton are presumed to be fraudulent transfers (i.e., made "with actual intent to hinder, delay or defraud creditors").  In opposition, Layton argues summary judgment is inappropriate because there are disputed issues of fact concerning (1) whether KOJO and Siena Office Park were part of the larger VesCor Ponzi scheme, and (2) whether Layton received the transfers for reasonably equivalent value and in good faith.

       1.     <u>The Ponzi Scheme Presumption Applies</u>

The Receiver's theory of fraudulent transfer relies on the Ponzi scheme doctrine to establish that the funds VesCor paid to Layton were fraudulent transfers.  <u>See</u> <u>Scholes v. Lehmann</u>, 56 F.3d 750 (7th Cir. 1995).  "Under the [Uniform Fraudulent Transfer Act], a debtor's actual intent to hinder, delay, or defraud is conclusively established by proving that the debtor operated as a Ponzi scheme."  <u>Warfield v. Carnie</u>, No. 3:04-cv-0633, 2007 WL 1112591 *2 (N.D. Tex. Apr. 13, 2007);  <u>Donell v. Kowell</u>, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.") (quoting <u>In re AFI Holding, Inc.</u>, 525 F.3d 700, 703 (9th Cir. 2008)); <u>In re Indep. Clearing House</u>, 77 B.R. 843, 860 (D. Utah 1987) ("One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.").

As explained in several prior opinions of this court, for purposes of this equity receivership action, the court has adopted the approach set forth in <u>Scholes v. Lehman</u>, 56 F.3d 750 (7th Cir. 1995).  <u>See, e.g.</u>, <u>Wing v. Williams</u>, 2011 WL 891121 (D. Utah March 11, 2011); <u>Wing v. Dockstader</u>, 2010 WL 5020959 (D. Utah Dec. 3, 2010); <u>Wing v. Holder</u>, 2010 WL

5021087 (D. Utah Dec. 3, 2010); Wing v. Hammons, 2009 WL 1362389 (D. Utah May 14, 2009); Wing v. Apex Holding Co., 2009 WL 2843343 (D. Utah Aug. 27, 2009). The theory under Scholes is broad and provides generally that the receiver for corporations that were operated by a Ponzi scheme principal has standing to assert fraudulent conveyance claims to recover amounts transferred by the corporations during the course of the Ponzi scheme. Id.

To invoke the Ponzi scheme doctrine, the Receiver has endeavored to prove that VesCor as a whole operated as a Ponzi scheme. As evidence, the Receiver relies on Mr. Gil A. Miller's forensic accounting investigation of VesCor's financial and business records, and testimony of VesCor employees and insiders. The sum of this information caused the Receiver's expert, Mr. Miller, to conclude that beginning in 2000 VesCor "exhibited characteristics of a Ponzi scheme." (Third Decl. of Gil A. Miller ¶8.)[6]

The Receiver's evidence on the issue of whether VesCor was a Ponzi scheme has not been rebutted by any credible evidence presented by Layton. Layton's accounting expert, Ms. Harper, expressly acknowledges that she did not conduct a review of the financial and accounting records of VesCor. She further admits she was not asked to opine about whether VesCor or VesCorp operated as a Ponzi scheme, and she does not refute Mr. Miller's analysis. In fact, the only declaration suggesting VesCor was not a Ponzi scheme comes from Southwick

---

[6]Layton filed a "Motion to Exclude Unreliable Opinion Testimony of Gil A. Miller." (Dkt. No. 153.) The court considered, addressed, and denied a nearly identical motion in a separate VesCor receivership case, Wing v. Fulbright & Jaworski, 2:09-CV-200 (D. Utah). For the same reasons as the court set forth in that case (which involved the same counsel as this case), the court denies Layton's motion. See Wing v. Fullbright & Jaworski, Case No. 2:09-CV-200, Dkt. No. 105, Tr. of January 4, 2011 hearing at 86-90 (providing detailed explanation for denying defendant's motion to exclude the expert opinions and expert report of Gil A. Miller).

himself. This does not raise a genuine issue of fact, and the court finds that the Receiver's

evidence has been no more controverted in this case than it has in any of the other ancillary cases

along the way. See Wing v. Williams, 2011 WL 891121, at *4 (D. Utah March 11, 2011); Wing

v. Dockstader, 2010 WL 5020959, at *4 (D. Utah Dec. 3, 2010), aff'd Wing v. Dockstader, 2012

WL 2020666 (10th Cir. 2012).

Not surprisingly, rather than attempt to rebut the Receiver's evidence that VesCor was a

Ponzi scheme, Layton argues that even if VesCor was a Ponzi scheme, the two projects with

which he was most involved – KOJO and Siena Office Park – were both profitable and

independent and were outside of any Ponzi scheme that might have existed. (Defs.' Opp'n at

123.) The court finds that neither the facts nor the law support Layton's argument on this point.[7]

First, the fact that the KOJO and Siena Office Park projects might have been profitable –

which the Receiver strongly disputes – misses the point. The Receiver appears to not dispute

that development activity occurred within the VesCor enterprise. (Pl.'s Reply at 6.) Even so,

seemingly legitimate business activity does not insulate companies from a finding that they were

operated as part of a Ponzi scheme. As the Receiver points out, ponzi schemes sometimes use

---

[7]Layton provided the expert report of accountant Melinda Harper in an attempt to show
that KOJO and Siena Office Park were not part of the VesCor Ponzi scheme. The Receiver then
filed a "Motion to Exclude Testimony and Opinions of Melinda Harper," asserting that Ms.
Harper is not qualified to render the opinions she offers and that her testimony is not based on
reliable data or methods, and therefore her testimony should be excluded under Fed. R. Evid.
702. (Dkt. No. 158.) The court agrees. Ms. Harper admits she did not conduct a review of the
financial and accounting records of VesCor, KOJO, or Siena Office Park, and she used estimated
operating expenses, despite the availability of actual operating costs in VesCor's records. In
sum, the court finds Ms. Harper's opinion and testimony about the independence and
profitability of Siena Office Park and KOJO is based on incomplete data and is, therefore,
neither helpful nor reliable. Accordingly, the Receiver's motion is GRANTED.

legitimate operations to attract investors, but this does not insulate those operations from the taint of the Ponzi scheme. (Pl.'s Mem. in Supp. at 24.) See, e.g., Jobin v. McKay, 84 F.3d 1330, 1332 (10th Cir. 1996) (Ponzi scheme existed where its perpetrator used the company's legitimate operations as a computer sales and leasing company as a front); Sender v. Simon, 84 F.3d 1299, 1302 (10th Cir. 1996) (Ponzi scheme existed in partnership hedge fund where "trading resulted in net profits in a few years," though "in most years the Hedged Investments operation realized net trading losses"). In Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995), Judge Posner analyzed and rejected a similar argument stating: "It is no answer that some or for that matter all of [phillip's] profit may have come from 'legitimate' trades made by the corporations. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations." Id. at 757.

This leads to the related and perhaps more important point: the KOJO and Siena projects – regardless of their ultimate profitability – were not independent of the larger VesCor scheme.[8] The money that funded both KOJO and Siena Office Park came from VesCor's co-mingled

---

[8]On October 22, 2012, Layton filed the Declaration of Stephen Johnson. (Dkt. No. 173.) The Johnson Declaration contains, among other things, Mr. Johnson's opinions concerning the legal separateness and independence of VesCor companies (particularly KOJO and Siena Office Park) as well as his opinion that the KOJO and Siena Office Park operations were not characteristic of a Ponzi scheme. (Dkt. No. 173, Johnson Decla. at 3-5.) The Receiver moved to strike the Declaration of Stephen Johnson, claiming the declaration was both untimely and an insufficient expert report. (Dkt. No. 188.) Having reviewed the relevant memoranda, the court agrees with the Receiver. The court finds the Johnson Declaration to be an untimely expert report, filed in violation of Rule 26(a), without substantial justification. Additionally, the court concludes that Mr. Johnson has failed to demonstrate the credentials necessary to opine as to whether VesCor was a Ponzi scheme, and Mr. Johnson's declaration contains additional improper legal conclusions relating to corporate ownership and tax obligations. In sum, the court agrees with and adopts the reasoning set forth in the Receiver's Reply Memorandum (Dkt. No. 193), and GRANTS the Receiver's Motion to Strike the Declaration of Stephen Johnson.

funds.  As Mr. Miller opined in his expert report, KOJO and Siena were both controlled by

Southwick and their assets were commingled with the other VesCor companies.  Moreover, in

addition to Mr. Miller's review, an independent audit performed in 2005 by Tanner, L.C., a local

public accounting firm, confirmed that KOJO and Siena were "under common control with

closely related and economically interdependent operations" with other VesCor companies.

(Pl.'s Mem. in Supp., Ex. EE, Tanner Audit.)  Similarly, the testimony of both Monique Fisher

and Jeff Galyean provide additional evidence that Southwick pooled all of the money, and the

funds in various bank accounts were treated as a single source of money when expenses came

due.  (Pl.'s Reply at 14.)

 Based on the foregoing, the court finds there is no genuine issue of fact whether VesCor

– which included KOJO and Siena Office Park – operated as a Ponzi scheme.  Applying the

Ponzi scheme doctrine, the Receiver's unchallenged evidence that VesCor operated as a Ponzi

scheme adequately establishes that the funds Layton received from VesCor were fraudulent

transfers within the meaning of the Uniform Fraudulent Transfer Act.  See Wing v. Holder, 2010

WL 5021087 at *2; see also Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006) (citing Scholes

v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995)).

 2. Affirmative Defense to the Fraudulent Transfers

 Having concluded that the Ponzi scheme presumption applies in this case, and therefore

the transfers to Layton are presumed to have been fraudulent, the court turns its attention to

whether Layton has an affirmative defense to the fraudulent transfers.  The Uniform Fraudulent

Transfer Act provides an affirmative defense to an otherwise fraudulent transfer if the transferee

accepted the transfer in good faith and for a reasonably equivalent value.  Utah Code Ann. § 25-6-9(1).   In other words, Layton must show (a) that he received funds from VesCor for reasonably equivalent value, and (b) that he received the VesCor funds in good faith.

(a)      Reasonably Equivalent Value

According to the Receiver, in addition to Layton's annual salary, VesCor gave Layton bonuses, commissions and equity interest in property in an amount totaling approximately $12 million dollars.  (Dkt. No. 157-72, Miller in Response to Harper Report, Ex. DDD2 at 19 (setting forth revised calculation of $12,753,039.61 in net disbursements to Layton – $3,650,000 of which is an estimate for equity in Siena Office Park 871).)  The Receiver asserts that Layton must return these funds and/or property interests because Layton cannot demonstrate that he received these additional funds in exchange for "reasonably equivalent value."[9]

Layton, on the other hand, argues that he received the bonuses, commissions and/or equity interests either pursuant to various transaction contracts or agreements with VesCor, or as a result of  "sweat equity" he invested in the projects.  According to Layton, his specialized skills and hard work contributed significantly to the success of the VesCor projects with which he was involved, and therefore he earned these additional funds and should be entitled to keep the bonuses, commissions and equity interests he received.  (Defs.' Mem. in Opp'n to S.J. at 111-13.)

In support of this claim, Layton relies primarily on the expert report of Mr. Steven G.

---

[9]As explained earlier, at the March 7, 2013 hearing, the Receiver stated that he was willing to "waive the return of the salary payments made to Mr. Layton," and is seeking only the return of financial transfers Layton received from VesCor in excess of his annual salary.  (Tr. of March 7, 2013 hearing at 7.)

Black.[10]  Mr. Black, a real estate lawyer and developer, opines generally that the additional

bonuses, commissions and equity interests Layton received from VesCor were "reasonable" and

consistent with industry practice.  (Defs.' Opp'n to Mot. to Exclude Testimony and Opinions of

Steven G. Black at 3.)  Using the KOJO project as an example, Mr. Black opines that Layton

was entitled to a $2.4 million dollar bonus when KOJO was sold, either pursuant to the terms of

an agreement (in which Layton acquired 51% of the equity in KOJO) or as a result of the "sweat

equity" Layton invested in the project.

　　　　However, in reaching this conclusion, Mr. Black acknowledged that he did not conduct

any kind of accounting or analysis to determine whether KOJO, in fact, sold for a profit.  In the

absence of any such analysis, the court finds Mr. Black had no basis for concluding Layton was

entitled to an equity distribution.[11]  Additionally, although Mr. Black asserts that regardless of

KOJO's ultimate profitability Layton was entitled to a bonus because of the "sweat equity" he

invested in the project, Mr. Black offers no guidance or analysis whatsoever as to the value of

"sweat equity."  And, Mr. Black fails to explain how "sweat equity" differs from the work

Layton was hired to perform and for which he earned his annual, six-figure salary.

　　　　Similarly, Mr. Black opines that the additional compensation and property Layton

received for his involvement in Siena Office Park was "reasonable."  However, once again, Mr.

---

[10]To the extent Layton also relies on the expert opinion of Melinda M. Harper, the court
has already considered, addressed and granted the Receiver's Motion to Exclude Testimony and
Opinions of Melinda Harper. See supra n.7.

[11]Moreover, the court has already concluded that each of these projects were part of the
larger VesCor entity, and it is undisputed that VesCor generated net operating losses in each year
of its existence.  Accordingly, there was no "equity" from which Layton could have received an
equity distribution.

Black failed to review or consider the relevant and available documents detailing the manner in which Layton acquired his interests in Siena. Instead, Mr. Black appears to have relied exclusively on Layton's explanation of events. (See Pl.'s Mem. In Supp. Of Mot. To Exclude Opinions and Testimony of Steven G. Black at 7-9.) Moreover, Mr. Black purports that this additional compensation was "reasonable" without ever identifying or setting forth the compensation Layton actually received.

In sum, having reviewed Mr. Black's expert report, the court finds Mr. Black's opinions to be unsupported, unreliable, and therefore unhelpful. As the Receiver explains in his Motion to Exclude the Testimony of Steven G. Black (Dkt. No. 150), it is not enough for a purported expert to simply assert that his opinion is based on his "experience." Rather, "an expert who is relying 'solely . . . on experience must explain how that experience leads to the conclusion reached, why the experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Lippe v. Bairnco Corp., 288 B.R. 678, 686 (S.D.N.Y. 2008) (quoting Fed. R. Evid. 702 advisory committee's note).

In this case, Mr. Black has failed to provide any basis for determining how his experience purports to provide a "substantial foundation" for the opinion he expresses. See Lifewise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). Mr. Black's report lacks any analysis of Layton's actual compensation and it provides no basis for calculating what "reasonable compensation" would have been for Layton's efforts. Mr. Black's opinions are unsupported by sufficient facts or data about the VesCor projects he reviewed, and he has failed to explain the methodology or principles he used to form his opinions. Instead, Mr. Black appears to rely solely on his experience in forming his opinions, yet he does not explain how his experience led

him to his conclusions.  Because Mr. Black has not gathered sufficient data or employed proper methodology, the court finds his opinions to be deficient and unreliable.  Accordingly, the court grants the receiver's motion to exclude Mr. Black's testimony.  (Dkt. No. 150.)

In light of the foregoing, the court concludes that Layton has failed to demonstrate that he provided reasonably equivalent value for the additional bonuses, commissions and/or equity interests he received.  In so concluding, the court is simply continuing to follow the Scholes model as it has in prior VesCor receivership cases.  For example, in Wing v. Holder, this court concluded that the Holder Family Trust, one of the early investors in VesCor, could not as a matter of law demonstrate reasonably equivalent value for monetary returns it received in excess of its original investment.  The court stated: "Payouts of returns on investments in a Ponzi scheme are not profits from an actual business venture.  Instead, 'they are payouts that deplete the assets of the scheme operator for the purpose of creating the appearance of a profitable business venture."  Wing v. Holder, 2010 WL 5021087, at *2-3 (D. Utah Dec. 3, 2010) (quoting Donnell v. Kowell, 533 F.3d 762, 777 (9th Cir. 2008)). So, although the Holder trust "was putting real money into [VesCor] and was getting what looked like real profits in return, in fact [it] never received 'reasonably equivalent value ' for its investment, just cash that was moved around in an elaborate shell game."  Id.

This court reached a similar conclusion with respect to commissioned sales agents and/or individuals who received referral fees for bringing new investors to VesCor.  See Holder, 2010 WL 5021087 at *2 ("Those who receive money for bringing new investors to a scheme have not provided reasonably equivalent value within the meaning of the Uniform Fraudulent Transfer Act"); Wing v. Dockstader, 2010 WL 5020959, at *6 (D. Utah Dec. 3, 2010) (providing that no

value is exchanged for efforts which merely serve to further the fraud).  In this context, the court in <u>Holder</u> explained that the defendant sales agent did not provide reasonably equivalent value for the referral fees he received, but rather "received money for essentially prolonging the fraud of and on the VesCor entities."  <u>Id.</u> at *2.  The court continued: "It takes cheek to contend that in exchange for the [sales commissions] he received, the [VesCor] scheme benefitted from his efforts to extend the fraud by securing new investments."  <u>Id.</u> (quoting <u>Warfield v. Byron</u>, 436 F.3d 551, 560 (5th Cir. 2006)); <u>see also</u> <u>Dockstader</u>, 2010 WL 5020959, at *7 (concluding defendant could not benefit from any agreement he had with VesCor for his contribution in keeping VesCor's fraudulent schemes afloat).

Given the facts of this case, and in light of this court's rulings in other VesCor Receivership cases, the court agrees with the Receiver's assertion that Layton is at least as culpable as VesCor's winning investors and commissioned sales agents, all of whom have been required to return transfers they received to the receivership estate.  (Pl.'s Reply at 2.) Therefore, the court concludes that Layton and has not brought forth sufficient evidence to support a finding that the money and/or equity he received (beyond his annual salary) was for "reasonably equivalent value."

        (b)       <u>Good Faith</u>

Because the Uniform Fraudulent Transfer Act requires a transferee to show both reasonably equivalent value *and* good faith, the court's prior conclusion – that Layton failed to show reasonably equivalent value – obviates the need to address whether Layton received the transfers in good faith.  Even so, it is the opinion of this court that, given Layton's extensive responsibilities and involvement with Val Southwick and VesCor, no reasonable fact finder

could conclude that Layton was not, at the very least, on "inquiry notice," and therefore he could not have received the transfers in good faith.

The United States Court of Appeals for the Tenth Circuit has stated: "A transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to a finding of good faith." <u>Jobin v. McKay</u>, 84 F.3d 1330, 1338 (10th Cir. 1996). The Tenth Circuit further explained that "good faith . . . should be measured objectively," and "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." <u>Id.</u>

Having reviewed the numerous exhibits filed by the parties in this case, the court finds Layton's involvement with Val Southwick and VesCor was substantial. In addition to being a Principal of VesCor, Layton was also the owner and manager of VesCorp Capital Group, which by itself raised millions of dollars that were used to repay its own investors, repay the older investors of VesCor, and prop up other VesCor projects that were losing money. Layton was also a manager of many VesCor companies and projects, and he signed documents memorializing investments and purported security for investors. Accordingly, the court concludes that at a minimum, given his responsibilities at VesCor, Layton reasonably should have known of its insolvency and fraudulent nature.[12] <u>See</u> <u>Jobin</u>, 84 F.3d at 1338 ("A transferee

---

[12]Contrary to Layton's argument, the court finds that Layton is not similarly situated to the defendant in <u>Wing v. Williams</u>, 2011 WL 891121 (D. Utah March 11, 2011), especially in light of the fact that the Receiver has agreed that he is not seeking the return of Layton's annual salary. In <u>Williams</u>, that was *all* the defendant wanted – to keep the hourly wages he earned while working for VesCor. <u>Id.</u> Although the court recognizes that, like <u>Williams</u>, it might be possible for Layton to persuade a fact-finder that there was a period of time during which he

who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to a finding of good faith.").

**CONCLUSION**

Having determined that (1) Layton has failed to refute the Receiver's evidence that VesCor operated as a Ponzi scheme and (2) Layton has failed to satisfy his burden of showing that he received funds from VesCor for reasonably equivalent value and in good faith, the court concludes that the transfers from VesCor to Layton were fraudulent transfers within the Uniform Fraudulent Transfer Act. Therefore, the Receiver's Motion for Summary Judgment is GRANTED.

However, the court also concludes that the precise amount of the fraudulent transfers Layton must return to the Receiver (i.e., the amount of Layton's liability) is a question requiring further attention. Accordingly, the court hereby orders the Receiver to submit additional briefing, within 30 days of the date of this Order, to identify the fraudulent transfers the Receiver is seeking to recover and the precise amount Layton must return to the Receiver. In the event these amounts are disputed, Layton shall have 30 days to file a response, and any reply by the Receiver shall be due 10 days thereafter.

In addition, and as set forth in greater detail above, the court rules as follows: Layton's Motion to Exclude Unreliable Opinion Testimony of Gil A. Miller (Dkt. No. 152) is DENIED; The Receiver's Motion to Exclude Testimony and Opinions of Melinda Harper (Dkt. No. 155) is

---

was receiving a salary for doing the very kind of work in which he was trained, and that he was earning his salary in good faith and for reasonably equivalent value, the Receiver's decision to not seek the return of Layton's salary obviates the need for a trial on this issue.

GRANTED; The Receiver's Motion to Strike the Declaration of Stephen Johnson (Dkt. No. 188) is GRANTED; the Receiver's Motion to Exclude Opinions and Testimony of Steven G. Black (Dkt. No. 150) is GRANTED; and Layton's Motion to Exclude Exhibit X to Receiver's Motion for Summary Judgment (Dkt. No 170) is GRANTED.

IT IS SO ORDERED.

DATED this 12th day of July, 2013.

_____
Dee Benson
United States District Judge